# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1422

_____

| | | |
|---|---|---|
| Arturo E. Martinez, an individual residing in Minnesota, also known as Arthuro E. Martinez, | * * * * | |
| Plaintiff - Appellant, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| W. W. Grainger, Inc., an Illinois corporation, | * * * | |
| Defendant - Appellee. | * | |

_____

Submitted: November 17, 2011
Filed: December 22, 2011

_____

Before WOLLMAN, MURPHY, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Arturo Martinez brought this action against his former employer, W.W. Grainger, Inc. (Grainger), alleging wage discrimination and termination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, the Minnesota Human Rights Act (MHRA), and 42 U.S.C. § 1981. Martinez also

claimed that Grainger breached his employment contract. The district court[1] granted summary judgment in favor of Grainger on all of Martinez's claims, and Martinez appeals. We affirm.

I.

Martinez was born in Cuba and began working for Grainger in 1994. Grainger sells facilities maintenance products through a national network of branches and distribution centers. In April 2003, Jeff Timm, a manager for the branches in Minnesota and some neighboring states, promoted Martinez to the position of branch manager for St. Paul. Timm supervised Martinez and twelve other branch managers. As Martinez's supervisor, Timm conducted annual performance reviews of Martinez and determined his annual salary increase and bonus. In July 2009 Timm decided to terminate him.

When Martinez began serving as St. Paul branch manager, his pay was increased to slightly more than that of his non Hispanic predecessor. Grainger classified its branches into three different levels based largely on the number of employees at each. The highest level was designated at 3. Each level corresponded to a salary range, and the salary range for each level overlapped with the salary range for the next biggest branch level. St. Paul was classified by Grainger as a level 2 branch while Martinez served as manager, and Timm stated that he considered St. Paul a high level 1 or low level 2 branch. Martinez was paid below the low end of the recommended range for a level 2 manager from 2003–2005 and in 2007.

In determining the annual merit salary increase, Timm reviewed the recommended salary ranges and but also considered the "complexity, volume of

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

business, originated sales, originated orders and assigned sales" at each branch. Timm took into account the branch manager's involvement in district, regional, or national business improvement efforts as well. Based on these metrics, Timm considered the St. Paul branch comparable to the branches in Rochester, St. Cloud, Sioux City, and Minneapolis. From 2003–2005 Martinez was paid more than some of the managers at these locations and less than others. From 2006–2009 Martinez was paid nearly the same as the St. Cloud branch manager but more than the Rochester, Sioux City, and Minneapolis branch managers, none of whom were Hispanic.

In his annual performance reviews, Timm consistently identified communication and leadership practices as areas in which Martinez must improve. While Martinez was on vacation in 2009, Timm noticed customers in the St. Paul branch waiting to be served. When he asked an employee who was present to help, the employee responded that he was not scheduled to work yet.

Timm became concerned about the overtime record at the branch. He spoke to a woman who worked for Martinez about whether employees were reluctant to work overtime, even when necessary. Timm testified in his deposition that this employee raised more pressing concerns about how Martinez was treating his employees. At her deposition the employee stated that she recalled speaking with Timm about overtime but did not remember expressing other concerns. When approached by Timm, a third employee described the environment at the branch as "really bad."

After his interactions with the three employees, Timm contacted human resources specialist Joyce LePage and requested that she conduct an investigation at the branch. LePage interviewed the branch employees individually. It is undisputed that no employee had ever lodged a formal complaint against Martinez, and employees commented that Martinez "ran a tight ship," provided opportunities for professional growth, and set high standards for the branch. But employees also reported in their interviews with LePage that Martinez created a fearful work

environment and described instances when he yelled, swore, and was demeaning, volatile, and intimidating to employees. At their depositions, employees were shown LePage's notes from her interviews with each of them. All but one confirmed that the notes accurately reflected their comments.[2] LePage and Timm discussed the employee comments and decided to meet with Martinez to get his perspective on them. LePage prepared a summary list of "recurring themes and descriptors" from the interviews to present to Martinez. LePage did not attribute the comments to specific employees to protect their confidentiality, explaining that this was standard practice and that she was particularly mindful that Martinez might retain his position and should not have that information.

Martinez was surprised at the comments and asked for specific examples. LePage provided one example in which an employee and several customers were locked out of the branch on a cold winter morning. The employee knocked on Martinez's window so that he would open the door. Martinez then entered the adjacent warehouse and yelled and swore at the employee who had not unlocked the door with such fervor that the locked out employee told LePage "if I [were him] I would have been crying." LePage also described an incident in which Martinez stood behind an employee who was on the phone with a customer and raised his voice, speaking to the employee in a manner described by other employees as "brutal" and "belittling."

Timm asked Martinez what he would do if he returned to work on Monday. Martinez later recalled his answer that there would need to be changes, but he could not remember if he said that he would need to change. Timm interpreted Martinez's response to focus on the employees as the problem. He believed that Martinez was not sufficiently acknowledging his own deficiencies or displaying a willingness to try

---

[2]One employee picked out two comments on LePage's handwritten notes that she did not recall stating.

to change his employees' perceptions of him. Timm asked Martinez what he would do about this if he were in Timm's shoes, and Martinez replied that he did not know. After the meeting Timm decided to terminate Martinez's employment, which LePage supported. Timm and LePage have both stated that Martinez was terminated in light of the seriousness of the employees' grievances combined with his own failure to "take[] ownership" of his managerial shortcomings.

Martinez sued Grainger for disparate treatment in his pay and termination based on his race and national origin in violation of Title VII, the MHRA, and 42 U.S.C. § 1981. Martinez asserts that he was the only branch manager paid below the salary range for that position. He points to five other branch managers who were not terminated despite comments in their employment records about their expressions of anger, leadership deficiencies, volatility, ineffective communication, and creation of a tense environment. In addition to several other statutory and common law claims, Martinez alleged that Grainger breached his employment contract.

The district court granted summary judgment to Grainger on all of the claims by Martinez. Martinez appeals the dismissal of his wage discrimination, termination, and breach of contract claims, arguing that he showed that Grainger's explanations were pretextual and that Grainger breached its contract by violating company and public policy under Minnesota law.

We review the grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Skare v. Extendicare Health Servs. Inc., 515 F.3d 836, 840 (8th Cir. 2008). Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

## II.

Title VII prohibits an employer from discharging an individual or discriminating against an individual with respect to his compensation on the basis of race or national origin. 42 U.S.C. § 2000e-2(a)(1). Claims under the MHRA are governed by the same standards as claims under Title VII. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005).

Here, the parties agree that Martinez did not present direct evidence of employment discrimination and that the burden shifting framework established in McDonnell Douglas Corp. v. Green applies. 411 U.S. 792, 802–04 (1973). Under this framework, Martinez must first establish a prima facie case of discrimination by showing (1) that he is a member of a protected class, (2) that he was meeting Grainger's legitimate job expectations, (3) that he suffered an adverse employment action, and (4) that similarly situated employees outside the protected class were treated differently. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (termination); cf. Ledbetter v. Alltel Corp. Svcs., Inc., 437 F.3d 717, 722 (8th Cir. 2006) (wage discrimination). If Martinez presents a prima facie case, the burden shifts to Grainger to rebut the presumption of unlawful discrimination by articulating a legitimate, nondiscriminatory reason for its adverse employment action. See Bearden v. Int'l Paper Co., 529 F.3d 828, 831 (8th Cir. 2008). The burden then returns to Martinez to prove that the proffered reason is a pretext for intentional discrimination. See Putman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir. 2003). We address Martinez's termination and pay claims in turn.

Martinez has established that he is Hispanic and Cuban born, that his performance reviews were satisfactory, and that he was terminated. Martinez has also shown that other branch managers engaged in similar conduct to his but were not terminated. See Wimbley v. Cashion, 588 F.3d 959, 962 (8th Cir. 2009) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981), and applying

"low-threshold" standard for plaintiff to show disparate treatment of similarly situated employees at prima facie stage). He has thus made out a prima facie case of discrimination.

The record shows, however, that Martinez failed to establish that Grainger's proffered legitimate, nondiscriminatory reason for his termination was pretextual. Timm and LePage testified that Martinez was terminated based on the gravity of his conduct as described by other employees and his perceived failure to take responsibility for the environment at the branch and his own leadership deficiencies. The deposition testimony of the branch employees confirmed that the notes LePage used to create the summary list for Martinez were accurate and that the specific examples she gave of his problematic managerial style were brought up during her investigation. Martinez also testified that he was unsure whether he had told Timm and LePage that he believed that he, rather than his employees, needed to change. According to Martinez, Timm explained to him that he was terminated because he "wouldn't take ownership of the (employee) complaints . . . [a]nd if [he] couldn't take ownership, [he] couldn't fix the problem." Martinez is thus unable to show that Grainger's stated reason for his termination was "unworthy of credence" because it has "no basis in fact," Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002), or has shifted over time. Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010).

Martinez has also not shown pretext through evidence that similarly situated non Hispanic or non Cuban born employees received more favorable treatment. At the pretext stage, Martinez had to show that the other branch managers were "similarly situated in all relevant respects" and that the "misconduct of the more leniently disciplined employees [was] of comparable seriousness." Wimbley, 588 F.3d at 962 (discussing rigorous test).

The evidence demonstrates that the five other branch managers differed from Martinez in material respects. None of the employment records for the other branch managers shows the same level of concern about volatility and hostile communications that Martinez's employees conveyed in their interviews with LePage. Concerns about some of the other managers focused on employee interest in receiving more feedback or the manager's unavailability to support their work. One manager was not supervised by Timm at the time the relevant comments were made. See Clark, 218 F.3d at 918. A manager described as moody and "overly aggressive" in his communications was placed on an improvement plan rather than being terminated because he gave thoughtful responses to concerns, had a history of high performance, and demonstrated a desire to improve his communication and leadership skills. This manager's employment records also included no reports of belittling, demeaning, and brutal behavior or of yelling and swearing at his employees. In sum, the record shows less problematic conduct by other managers and their clear commitment to improving their own leadership skills.

We conclude that the district court did not err in granting summary judgment to Grainger on Martinez's Title VII and MHRA claims that his termination was a result of unlawful discrimination.

Martinez also claimed wage discrimination. Even assuming that he made out a prima facie case by showing that he was the only branch manager paid below the recommended salary range based on branch level, Martinez did not meet his burden of showing that Grainger's explanation for his compensation was pretextual. See Ledbetter, 437 F.3d at 722 (reviewing prima facie showing of wage discrimination on the basis of race).

In this claim Martinez focuses on the facts that St. Paul was the sixth largest branch in the district and that he was the only manager paid below Grainger's recommended salary range. Timm stated, however, that the designated level of the branch and corresponding salary range was only one consideration in determining pay

and that his evaluation of managers reflected several other criteria related to sales volume and business complexity. See Wimbley, 588 F.3d at 962 (comparators must be similarly situated in all relevant respects). The documents submitted in support of Martinez's assertion that St. Paul was the sixth largest branch do not include a ranking of branches by overall size. Instead, the evidence shows that during the time period in which Martinez was either the eighth or ninth highest paid branch manager, the St. Paul branch ranked in the bottom quartile on many of the metrics identified by Timm as the basis for compensation decisions. Martinez does not dispute the evidence that Timm considered the St. Paul branch comparable to the branches in Rochester, St. Cloud, Sioux City, and Minneapolis and that he was paid more than the managers in these branches at various points during his tenure. The district court properly granted summary judgment on this record to Grainger on Martinez's discriminatory wage claims.

III.

Martinez also appeals the district court's grant of summary judgment to Grainger on his breach of contract claim. Counsel agreed at oral argument that Martinez had no formal employment contract with Grainger. Martinez contends, however, that he accepted Grainger's offer of a unilateral contract by his continued employment. He relies on Pine River State Bank v. Mettille, 333 N.W.2d 622, 626–30 (Minn. 1983), which found an offer of unilateral contract based on language in an employee handbook, but Martinez does not point to any provision in Grainger's employee handbook which supports that theory. He further alleges that Grainger was obligated to provide appropriate notice of any deficiencies and place him on a performance improvement plan before terminating his employment.

The record does not support the creation of a unilateral contract. See Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 745 (Minn. 2000) (handbook provisions too indefinite to be offer of unilateral contract). Grainger's employee handbook expressly declares that employment is at will and that the policies and

benefits described do not create an express or implied employment contract. Martinez submitted no evidence that Grainger invariably placed an employee on a performance improvement plan prior to termination but departed from this policy in his case. The evidence actually shows that such a decision is discretionary with the supervisor.

Alternatively Martinez relies on an exception to the at will employment doctrine that prohibits employers from discharging an at will employee for refusing to violate a "clearly mandated public policy." See Phipps v. Clark Oil & Ref. Co., 408 N.W.2d 569, 571 (Minn. 1987) (allowing wrongful discharge claim for at will employee who was terminated for refusing to violate Clean Air Act). Martinez argues that this exception applies because Timm required him to take ownership of conduct that had not occurred. Employee depositions show however that the conduct presented to Martinez in LePage's list accurately reflected employee perceptions. Moreover, Timm's demand that Martinez take ownership of the issues at the branch did not establish violation of "any state or federal law or rule or regulation adopted pursuant to law" for the at will exception to attach. Id. In the absence of evidence of an employment contract or any exception to at will employment, Martinez's breach of contract claim fails.

Martinez's final claim is that Grainger violated 42 U.S.C. § 1981, which prohibits racial discrimination in the making of private and public contracts. See St. Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987). Because this claim is premised on the existence of discriminatory conduct in the context of an employment contract which Martinez failed to show, the district court did not err in granting Grainger summary judgment on it.

IV.

Accordingly, the judgment of the district court is affirmed.

_____