# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3179

_____

| | | |
|---|---|---|
| Grant A. Gomez and Lanie L. Gomez,<br>on behalf of themselves and all<br>others similarly situated,<br><br>Appellants,<br><br>v.<br><br>Wells Fargo Bank, N.A. and<br>Valuation Information Technologies,<br>LLC, doing business as Rels Valuation,<br><br>Appellees. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Appeal from the United States<br>District Court for the<br>District of Minnesota. |

_____

Submitted: October 20, 2011
Filed: April 12, 2012

_____

Before RILEY, Chief Judge, SHEPHERD, Circuit Judge, and WEBBER,[1] District Judge.

_____

RILEY, Chief Judge.

Grant A. Gomez and Lanie L. Gomez (the Gomezes) sought to establish a nationwide class of thousands of borrowers who allegedly paid inflated appraisal fees in connection with real estate transactions financed by Wells Fargo Bank, N.A. (Wells

___

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

Fargo). The Gomezes appeal the district court's[2] dismissal of their claims contending the appraisal practices of Wells Fargo and Valuation Information Technology, LLC d/b/a Rels Valuation (Rels, and collectively, appellees) unjustly enriched Rels and violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.; the Real Estate Settlement Procedures Act of 1974 (RESPA), 12 U.S.C. § 2601 et seq.; California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq.; and Arizona's anti-racketeering statute, Ariz. Rev. Stat. § 13-2314.04 (AZRAC). We affirm.

## I.     BACKGROUND
### A.     Facts[3]

The Gomezes are a married couple from Scottsdale, Arizona who mortgaged and refinanced their home through Wells Fargo. Wells Fargo is a national banking association that provides mortgages through Wells Fargo Home Mortgage. Rels is an Iowa limited liability company headquartered in Minnesota. Rels, which arranges real-property appraisals, is a joint venture of Wells Fargo Foothill (WFF), an affiliate of Wells Fargo, and First American Real Estate Solutions (First American), a subsidiary of First American Corporation. WFF owns 49.9% of Rels, and First American owns 50.1%.

In March 2006, the Gomezes purchased a home in Scottsdale, Arizona with a loan from Wells Fargo and executed a mortgage on the property in Wells Fargo's favor. On March 2, 2006, the Gomezes signed a HUD-1[4] settlement statement

---

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[3]"We recite the facts in the light most favorable to [the Gomezes]." Malone v. Ameren UE, 646 F.3d 512, 514 (8th Cir. 2011).

[4]The United States Department of Housing and Urban Development (HUD) prescribes form HUD-1 to set forth the settlement charges for a residential real estate

disclosing the Gomezes would incur an appraisal fee of $375, to be paid to Rels as Wells Fargo directed.

On March 1, 2007, the Gomezes refinanced the Scottsdale property through Wells Fargo and executed another mortgage. In connection with that refinancing, Wells Fargo sent the Gomezes a HUD-1 Good Faith Estimate disclosing Wells Fargo had a business relationship with Rels and estimating the appraisal fee would be between $50 and $650. On March 5, 2007, the Gomezes signed the HUD-1 settlement statement for the refinancing, which indicated the Gomezes would pay Rels an appraisal fee of $495.

The Gomezes maintain the settlement statements they received were misleading because they did not disclose Rels would not perform the actual appraisal and that the actual cost of the appraisal would be much less than the amount charged. The Gomezes allege Rels paid the actual appraisers no more than $200 and "skimmed the difference" at closing.

In what they describe as an "Inflated Appraisal Fee Scheme" between Wells Fargo and Rels, the Gomezes allege "Wells Fargo required [the Gomezes] and [c]lass members to use Rels Valuation, both to reap the significant profits derived from the appraisals on Wells Fargo loans and to control the appraisal process and guarantee that Wells Fargo could close whatever loans it wanted to, irrespective of the actual market values of the properties on which it was lending." The Gomezes describe the scheme as follows.

Wells Fargo sends a good-faith estimate to a prospective borrower, disclosing Wells Fargo will require an appraisal from an approved appraiser. Wells Fargo then specifies Rels, which "contacts independent appraisers to perform the appraisal . . . at

transaction. See 24 C.F.R. § 3500.2(b).

a very low rate." Because of Wells Fargo's dominant market position, Rels demands appraisers charge "a reduced fee that is far below the market rates the appraiser had been charging." Some independent appraisers have informed Wells Fargo and Rels the rates are "so low that a proper appraisal cannot be performed," but Wells Fargo "insists on a vastly reduced rate, sacrificing quality for price." If the appraiser refuses to lower its rates, it is removed from Wells Fargo's list of approved appraisers.

Despite requiring appraisers to charge Rels "far under the prevailing market rate," "Rels Valuation does not pass on the reduced appraisal fees to the home buyer." Rather, "Wells Fargo maintain[s] market rates to its borrowers." "While some Wells Fargo customers are told of the affiliated relationship between Wells Fargo and Rels Valuation, none know . . . the appraisal fee set forth on the HUD-1 Settlement Statement" far exceeds the actual cost of the field appraisal. Neither Rels nor Wells Fargo discloses Rels's "markup to the borrower, and Rels Valuation performs no additional appraisal services beyond merely forwarding the appraisal to Wells Fargo or the escrow provider for the transaction."

According to the Gomezes, in exchange for increased referrals, Rels "gives Wells Fargo visibility into the appraisal process and substantial control over the outcome of the appraisal." The Gomezes argue Wells Fargo also benefits "through the profits rolled up to the parent company of Wells Fargo and Rels." The Gomezes claim this "scheme" harmed them and the putative class members by causing them to pay too much for appraisals and often depriving them of the benefit of an accurate appraisal.

### B.    Prior Proceedings

On January 30, 2009, the Gomezes filed a class-action complaint against Wells Fargo and Rels in the United States District Court for the District of Arizona. On March 17, 2009, the Gomezes amended the complaint. See Fed. R. Civ. P. 15(a)(1). On April 20, 2009, with leave of court, the Gomezes filed a six-count second amended class-action complaint (complaint).

-4-

In Count I of the complaint, the Gomezes alleged Wells Fargo and Rels engaged in a pattern of racketeering and conspiracy in violation of RICO, 18 U.S.C. § 1962(c) and (d). In Count II, they asserted Rels violated Section 8(b) of RESPA, 12 U.S.C. § 2607(b), by marking up third-party appraisal fees. In Count III, they alleged Wells Fargo and Rels violated Section 8(a) of RESPA, 12 U.S.C. § 2607(a) and (c), because Rels allegedly gave Wells Fargo "control over the appraisal process and results" in exchange for appraisal referrals. In Count IV, they claimed Rels was unjustly enriched by the alleged markup of appraisal fees. In Count V, they alleged Wells Fargo's appraisal practices constituted unfair competition under the UCL. And in Count VI they asserted appellees engaged in a pattern of unlawful racketeering activity in violation of AZRAC.

On May 4, 2009, Wells Fargo and Rels individually moved to dismiss all claims against them pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 9(b). The next day, they jointly moved to transfer the case to the District of Minnesota. On July 2, 2009, the Arizona district court granted the appellees' joint motion and transferred the case. In September 2009, Rels and Wells Fargo filed renewed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim.

On August 30, 2010, the district court granted, with prejudice, Wells Fargo's and Rels's motions to dismiss for failure to state a claim with respect to Counts I, II, III,[5] V, and VI. Noting the Gomezes' allegations admitted Wells Fargo charged

---

[5]Appellees challenged the Gomezes' standing under Article III of the United States Constitution to raise a RESPA Section 8(a) claim, but the district court decided the Gomezes had standing "regardless of whether there was an overcharge or whether the cost of the services was otherwise inflated." On June 20, 2011, the Supreme Court of the United States granted certiorari in Edwards v. First Am. Corp., 610 F.3d 514 (9th Cir. 2010), cert. granted in part, ___ U.S. ___, 131 S. Ct. 3022 (2011), to determine whether a private purchaser of real estate settlement services has Article

borrowers market rates for appraisals, the district court concluded the Gomezes lacked statutory standing under RICO, AZRAC, and the UCL because the Gomezes did not suffer a "concrete financial loss." The district court dismissed the Gomezes' RESPA Section 8(a) claim because the Gomezes failed to show Rels gave Wells Fargo a "thing of value," and their RESPA Section 8(b) claim because they did not allege unlawful fee splitting. Declining to exercise supplemental jurisdiction over the Gomezes' unjust enrichment claim, the district court dismissed Count IV without prejudice. The Gomezes appeal.

## II.    DISCUSSION

### A.    Standard of Review

We review the district court's dismissal of the Gomezes' complaint de novo, accepting as true the factual allegations contained in the complaint and granting the Gomezes the benefit of all reasonable inferences that can be drawn from those allegations. See Lustgraaf v. Behrens, 619 F.3d 867, 872-73 (8th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### B.    RICO and AZRAC

"Section 1962 of the RICO Act makes it 'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

---

III standing in the absence of a "claim that the alleged violation affected the price, quality, or other characteristics of the settlement services provided." Because appellees do not challenge the district court's ruling and there is no dispute the Gomezes allege an overcharge, we need not delay disposition of this case.

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009) (quoting 18 U.S.C. § 1962(c)). "Any person injured in his business or property by reason of a violation of [§ 1962] may sue therefor" in federal court and recover treble damages. 18 U.S.C. § 1964(c). Similarly, AZRAC authorizes suit by "[a] person who sustains reasonably foreseeable injury to his person, business or property by a pattern of racketeering activity."[6] Ariz. Rev. Stat. § 13-2314.04(A), (T).

"To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation." Asa-Brandt, Inc. v. ADM Investor Servs., Inc., 344 F.3d 738, 752 (8th Cir. 2003). "[A] showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest." Regions Bank v. J.R. Oil Co., LLC, 387 F.3d 721, 728 (8th Cir. 2004) (quoting Steele v. Hosp. Corp. of Am., 36 F.3d 69, 70 (9th Cir. 1994) (internal quotation marks omitted)).

Applying these standards to the Gomezes' complaint, the district court determined the Gomezes lacked standing under RICO and AZRAC because "the alleged RICO violations did not cause the Gomezes to suffer any 'concrete financial loss.'" Noting "[t]he complaint concedes that 'Wells Fargo maintained **market rates**

_____

[6]The Gomezes do not dispute the district court's conclusion the Gomezes conceded "that there is no substantive difference between the Arizona [AZRAC] and federal RICO standing requirements." Like the district court, we analyze those claims together. See Rosier v. First Fin. Capital Corp., 889 P.2d 11, 15 (Ariz. Ct. App. 1994) (interpreting AZRAC consistent with RICO because the Arizona "legislature patterned [AZRAC] after the federal RICO statute").

to its borrowers,'" the district court determined the Gomezes "would have been in the same [financial] position in the absence of the alleged RICO violations."

The Gomezes assert they "adequately allege[d] several grounds that support their standing under RICO even if [Wells Fargo] 'maintained market rates to its borrowers for appraisals.'" We disagree.

The Gomezes first argue appellees violated RICO "by deceptively convincing [the Gomezes] that the $495 paid to Rels was the actual cost of the appraisal when the actual cost was $200 or less" and not passing on the reduced rate or disclosing the markup to the borrower. According to the Gomezes, their "damages are measured by the amount by which [the appellees] marked up their appraisal fee, regardless of 'fair market value.'"

In support of this theory of RICO liability, the Gomezes rely on Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc., 262 F.3d 260, 265 (4th Cir. 2001), in which the Fourth Circuit stated,

> If a party specifically bargains for a service, is told that the service has been performed, is charged for the service, and does not in fact receive the service, it is not appropriate for courts to inquire into whether the service "really" had value as a precondition to finding that injury to business or property has occurred. See Hellenic Lines, Ltd. v. O'Hearn, 523 F. Supp. 244, 248 (S.D.N.Y. 1981) (stating that RICO injury is proved where a company demonstrated that "padded" bills resulted in payment for services not rendered).

The Gomezes assert they "paid a padded bill for appraisal services and, therefore, have standing under RICO."

The Gomezes' reliance on Potomac and Hellenic is misplaced. As the district court noted, neither case is persuasive because the plaintiffs in those cases "alleg[ed]

that they paid for services they did not receive." In contrast, the Gomezes admit they received appraisal services and paid market rates for those services. The Gomezes simply fail to allege a concrete financial loss as required by RICO and AZRAC.

The Gomezes next argue their "general allegations about market value are irrelevant" because "the fair market value of the appraisals at issue is measured by the actual amounts paid by Rels to the appraisers." The Gomezes contend they were harmed when appellees "reset the market to the level that [appellees] paid the appraisers but charged [the Gomezes] far in excess of that new market rate."

We decline the Gomezes' invitation to ignore the factual allegations in the complaint in favor of a flawed method of determining fair market value belatedly conceived in an attempt to avoid dismissal. By focusing exclusively on one part of the appraisal process—the field work—the Gomezes' suggested method completely ignores the appraisal management services the Gomezes admit Rels provided. More importantly, the market rate that matters for determining whether the Gomezes suffered a concrete financial loss is the market rate charged to borrowers, which the Gomezes admit did not change as a result of the challenged practices.

Finally, the Gomezes contend they suffered a financial loss because "they did not receive an appraisal worth the apparent market value for a valid, independent appraisal." This argument is unpersuasive. The Gomezes fail to articulate any defect in their appraisals or any direct financial harm they suffered as a result of the appraisals performed on their property. As Rels points out, the primary purpose of an appraisal is to protect the lender's interests by ensuring the value of the collateral is sufficient to secure the loan. See 12 U.S.C. § 2607(c) (allowing for "a real estate appraiser chosen by the lender to represent the lender's interest in a real estate transaction").

Because the Gomezes did not plausibly allege a concrete financial loss caused by a RICO violation, the district court did not err in concluding they lacked standing under RICO and AZRAC. See Brennan v. Chestnut, 973 F.2d 644, 648 (8th Cir. 1992) ("A RICO plaintiff has standing only if injured in his business or property.").

### C.    UCL Claim

The Gomezes allege Wells Fargo's appraisal process violates the UCL. "The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." Kasky v. Nike, Inc., 45 P.3d 243, 249 (Cal. 2002). A plaintiff has standing to enforce the UCL only if the plaintiff has "suffered injury in fact and has lost money or property as a result of such unfair competition." Palmer v. Stassinos, 419 F. Supp. 2d 1151, 1154 (N.D. Cal. 2005) (quoting Cal. Bus. & Prof. Code § 17204) (internal quotation marks omitted).

The Gomezes claim they have standing to assert their claim Wells Fargo violated the UCL by charging more than the actual cost of the appraisal regardless of the appraisal's market value. In support, the Gomezes rely on McKell v. Wash. Mut., Inc., 49 Cal. Rptr. 3d 227, 241 (Cal. Ct. App. 2006), in which the plaintiffs alleged a lender led its borrowers to believe the lender was charging the borrowers for the cost of certain third-party mortgage services, "when in reality it [was] charging them substantially in excess of such costs." The state appellate court decided the plaintiffs sufficiently "alleged unfair business practices within the meaning of the UCL," id., and "stated a UCL cause of action for unlawful business practices based on violation of RESPA," id. at 252-53.

McKell fails to support the Gomezes' argument for two reasons. First, the court in McKell did not consider the question of standing, and the case has no persuasive value for that issue. See San Diego Gas & Elec. Co. v. Superior Court, 920 P.2d 669, 699 (Cal. 1996) (explaining "[c]ases are not authority, of course, for issues not raised and resolved").

-10-

Second, unlike the Gomezes, the plaintiffs in <u>McKell</u> alleged the lender overcharged borrowers for mortgage services by charging the borrower more for those services than the lender paid the third-party service provider. <u>See</u> <u>McKell</u>, 49 Cal. Rptr. 3d at 234. There is no such allegation here. The Gomezes admit Wells Fargo charged them market rates for appraisal services as disclosed on the settlement statements. In light of that admission, we agree with the district court that "the complaint cannot plausibly allege that the Gomezes 'lost money or property' as a result of Wells Fargo's conduct." The district court's dismissal was correct.

### D. RESPA Section 8(a)

The Gomezes contend the "district court erroneously dismissed [the Gomezes'] claim under Section 8(a) of RESPA, 12 U.S.C. § 2607(a), on the ground that [the Gomezes] failed to allege that Wells Fargo received a 'thing of value' from Rels in exchange for referring work to it." Section 8(a) provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

"[T]he term 'thing of value' includes any payment, advance, funds, loan, service, or other consideration." 12 U.S.C. § 2602(2). The regulations further define the term broadly to include

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free

-11-

rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation.

24 C.F.R. § 3500.14(d).

The Gomezes allege Wells Fargo "violates RESPA's prohibition on referral fees because it gets a thing of value—*i.e.*, control of the appraisal process and outcome" "[a]s a *quid pro quo* exchange for the referral from Wells Fargo to Rels." Appellees contend the Gomezes' allegations of "control of the appraisal process and results" are too different in kind from the kickbacks and fees listed in the statutory and regulatory definitions to constitute a thing of value.

The Gomezes' failure to provide support for their novel definition of the term "thing of value" suggests it is too broad. But even if we assume control of the appraisal results could be a thing of value for purposes of a RESPA Section 8(a) violation, the Gomezes' vague allegations fail plausibly to allege Rels provided Wells Fargo such improper control. Although the Gomezes' argument is predicated on Rels giving Wells Fargo control over the appraisal results, the Gomezes repeatedly emphasize Rels did not perform the appraisals. Instead, the Gomezes allege Rels "performed no work and provided no appraisal services toward completion of the Gomezes' appraisal."

The Gomezes fail to explain how Rels abdicated control or improperly manipulated appraisals for Wells Fargo's benefit in exchange for referrals when, "[i]n fact, Rels Valuation does not appraise properties and did not appraise the Gomezes' property. Instead, Rels Valuation hired an appraiser on its approved list" and "merely forward[ed] the appraisal to Wells Fargo or the escrow provider." Notwithstanding the Gomezes' bald allegations of collusion, the Gomezes do not plausibly allege either Rels or Wells Fargo made any effort to influence or manipulate improperly the

-12-

results of appraisals performed by admittedly "independent [third-party] appraisers." Nor do the Gomezes articulate any specific benefit Wells Fargo purportedly received by controlling the results of the appraisals performed on their property, much less that Wells Fargo manipulated the appraisals to obtain such an improper benefit to the detriment of the Gomezes.

Even if Rels actually completed the appraisals, the Gomezes would have to allege more than the mere fact of a referral and the possibility of improper control to sustain a claim under Section 8(a). Section 2607(c) allows Wells Fargo to choose a "real estate appraiser . . . to represent [Wells Fargo's] interest in a real estate transaction." Under the Gomezes' interpretation of 12 U.S.C. § 2602(2), a plaintiff could, simply by making vague allegations of improper control, maintain a Section 8(a) claim any time a lender exercises its statutory right to choose an appraiser or appraisal management company. Such an interpretation is not consistent with Twombly. See Iqbal, 556 U.S. at ___, 129 S. Ct. at 1949 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.").

### E.    RESPA Section 8(b)

The Gomezes contend the district court erred in deciding they failed to allege Rels engaged in fee splitting in violation of Section 8(b) of RESPA, 12 U.S.C. § 2607(b). Section 8(b) states:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

In the complaint, the Gomezes allege Rels violated Section 8(b) by "receiving a portion, split and percentage of a fee for the rendering of a real estate settlement service other than for services actually performed" "[b]y charging appraisal fees in

-13-

transactions in which [Rels] ha[s] not performed the appraisal which are far in excess of the actual cost of the appraisal charged by a third party." We agree with the district court that this claim is foreclosed by our decision in Haug v. Bank of Am., N.A., 317 F.3d 832 (8th Cir. 2003).

In Haug, we held "Section 8(b) is an anti-kickback provision that unambiguously requires at least two parties to share a settlement fee in order to violate the statute." Id. at 836. As such, the Haugs' allegation that the bank charged them "more for certain services than [the lender] paid for them" did not state a claim because "an overcharge, standing alone, does not violate Section 8(b) of RESPA." Id. The result is the same here. Broadly construed, the complaint alleges an improper markup or simple overcharge, not fee splitting. Such allegations do not support a Section 8(b) claim under our controlling precedent.[7] See Haug, 317 F.3d at 840 (holding "the plain language of Section 8(b) requires plaintiffs to plead facts showing that the defendant illegally shared fees with a third party").

The Gomezes' belated theory of fee splitting also fails. The Gomezes' allegations of a Section 8(b) violation in Count II focus exclusively on Rels's *receipt* of purportedly excessive appraisal fees. In resisting Rels's motion to dismiss based upon our holding in Haug, the Gomezes argued for the first time "the Wells Fargo entities share in the illegal fees by virtue of their ownership interest in Rels. This sharing of fees falls within the plain language of [S]ection 8(b)." The only support

---

[7]The Supreme Court has granted certiorari in Freeman v. Quicken Loans, Inc., 626 F.3d 799, 802 (5th Cir. 2010), cert. granted, ___ U.S. ___, 132 S. Ct. (2011), to determine "[w]hether Section 8(b) of RESPA prohibits a real estate settlement services provider from charging an unearned fee only if the fee is divided between two or more parties." The case should resolve a split between the Eighth, Seventh, Fourth and now the Fifth Circuits, all of which have held a fee must be divided with a third party to be actionable, and the Second, Third, and Eleventh Circuits (as well as HUD) which opine a charge involving only one party may violate Section 8(b).

-14-

the Gomezes could muster for their alternative theory of liability was one general allegation in a section of the complaint labeled "Parties" that alleged Rels "is a joint venture between First American Real Estate Solutions, a subsidiary of First American Corporation, and Wells Fargo Foothill, a subsidiary of Wells Fargo & Co., the parent of Wells Fargo Bank."

Federal Rule of Civil Procedure 8(a)(2), which sets forth the general rules of pleading, requires "a short and plain statement of the claim showing that the pleader is entitled to relief." "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). This short and plain statement must "provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Eckert v. Titan Tire Corp., 514 F.3d 801, 806 (8th Cir. 2008) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

The district court found the complaint did "not allege or even suggest [the Gomezes' alternative] theory of fee-splitting." We agree. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Twombly, 550 U.S. at 556 n.3. Because the complaint failed to plead sufficient facts to give Rels fair notice of the Gomezes' fee splitting theory and did not contain a simple, concise, and direct statement of the alternative grounds the Gomezes asserted to resist dismissal of their RESPA Section 8(b) claim, the district court did not err in dismissing that claim.

## F. Leave to Amend Complaint

We also reject the Gomezes' assertion that the district court erred in dismissing their claims with prejudice rather than sua sponte allowing the Gomezes leave to amend the complaint a third time. See Fed. R. Civ. P. 15. "A district court does not abuse its discretion in failing to invite an amended complaint when plaintiff has not moved to amend and submitted a proposed amended pleading." Drobnak v. Andersen

-15-

Corp., 561 F.3d 778, 787 (8th Cir. 2009) (quoting Meehan v. United Consumers Club Franchising Corp., 312 F.3d 909, 913 (8th Cir. 2002) (internal quotation marks omitted)).

Despite appellees' detailed motions for dismissal, the Gomezes chose to stand on their complaint, confident their allegations were sufficient. The district court did not abuse its discretion in accepting the Gomezes' strategic decision not to amend the complaint. See Mitan v. McNiel, 399 F. App'x 144, 145 (8th Cir. 2010) (unpublished per curiam) (explaining the district court "did not abuse its discretion in denying [the plaintiff's] post-dismissal motion for leave to amend, because he chose to stand on his pleadings in the face of the motion to dismiss, which identified the very deficiency upon which the court dismissed the complaint").

## III. CONCLUSION

We affirm the district court's judgment.

_____