# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3505

_____

Craig Singletary,                                  *
                                                   *
            Appellant,                             *
                                                   *   Appeal from the United States
      v.                                           *   District Court for the
                                                   *   Western District of Missouri.
Missouri Department of Corrections,                *
                                                   *
            Appellee.                              *

_____

Submitted: May 9, 2005
Filed: September 14, 2005

_____

Before LOKEN, Chief Judge, BEAM and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Appellant Craig Singletary filed suit against the Missouri Department of Corrections ("the Department") alleging violations of Title VII of the 1964 Civil Rights Act and 42 U.S.C. § 1981 arising out of his employment as an Investigator with the Department. The district court[1] granted summary judgment in favor of the Department. Singletary appeals arguing that genuine issues of material fact remain thus precluding summary judgment. We affirm.

_____

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

## I. *Background*

Craig Singletary, an African-American male, was hired by the Department in September 1996 as a Corrections Officer I at the Jefferson City Correctional Center. In March 1998, Singletary voluntarily transferred to the Western Missouri Correctional Center (WMCC) in Cameron as a corrections officer and was soon promoted to the position of Investigator II.[2] Initially, Singletary had supervisory authority over another investigator, Bill Black, a white male. At the time of his transfer, Singletary's supervisor, the WMCC superintendent, was a white female, Lynda Taylor. Taylor was responsible for Singletary's promotion to Investigator II as she requested his appointment to investigator.

After a reorganization within the Department, investigators began reporting to an office in Jefferson City. Sko Grimes was the Inspector General of the Jefferson City office, and Mike Payne served as an intermediate supervisor between Grimes and the investigators. On April 8, 1998, Captain Corbett Fasching, an employee at WMCC, filed a written complaint against Singletary and, on April 10 and 11, orally referred to Singletary as a "nigger." In one of the remarks, Captain Fasching stated "you mean I can't call him a nigger" to Major Bob Gray. Major Gray reported the comment to a Human Relations Officer. Superintendent Taylor inquired about racist statements and Singletary voiced his concerns of racism to Supervisor Payne. Captain Fasching was demoted and transferred to another prison facility.

On April 15, Superintendent Taylor suspended Singletary and Black, while still in their probationary employment period, for allegedly conducting unauthorized investigations of the state vehicles assigned to Superintendent Taylor, and Mike Kemna, the Superintendent of a nearby correctional center, the Crossroads

---

[2]The primary responsibility of Investigators with the Department is to investigate allegations of impropriety or wrongdoing by other employees at the Department.

Correctional Center (CRCC). Further investigation into the events revealed that neither Singletary nor Black conducted the unauthorized investigations. The suspension—with pay and benefits—lasted eighty-nine days. Upon reinstatement, Black and Singletary were initially assigned to work at CRCC. The two were allowed to return to WMCC a few weeks later. Because Singletary and Black were on probation during their administrative leave, Superintendent Taylor requested that Michael Grease, Assistant Zone Director, extend their probationary periods to allow for a more accurate assessment of their abilities. Taylor's request was granted and Black's and Singletary's probationary period was extended eighty-nine days. During the extended suspension, Superintendent Taylor was replaced by Superintendent Steve Moore.

During Singletary's employment at WMCC, other employees and offender-residents of WMCC filed complaints against him. The department investigated each of those complaints. The investigations led to searches of Singletary's office, desk, briefcase, and in one instance, his confidential file cabinet. Although partially substantiated, none of the minor complaints prevented Singletary from being continually rated as "successful" or "highly successful" as an investigator. WMCC investigated complaints against white male investigators as well.

Also during Singletary's tenure, the Department investigated damage (scratches, damaged antenna, and flattened tires) done to Singletary's car at the work place. When Superintendent Moore learned of the damage to Singletary's car, he called local law enforcement. Bill Johnson, the Department's human resource officer, opined that Singletary was a "target" of other WMCC employees. Johnson's investigation revealed that WMCC resident-offenders and employees were sometimes attacked for helping Singletary perform his job as an internal investigator. He also noted that there appeared to be a racial problem at the WMCC. Inspector General Grimes met with Superintendent Moore to try and resolve the situation.

During the investigation of one complaint, Correctional Officer Gary Harper overheard another employee say that the "niggers around here always want to cause trouble." In October 2002 and March 2003, Superintendent Moore referred to Singletary, stating, "I see we have a little shiny face with us today," and "I see we have a shiny, little face running around here today." In another instance, WMCC staff posted a picture of Aunt Jemima in the prison during Black History Month.

Eventually, to resolve a grievance he had filed, Singletary proposed to the administration that he be transferred to the Kansas City Community Release Center (KCCRC). The Department responded that there were no Investigator II positions available at KCCRC, but that he could transfer there as an Investigator I and maintain his grade and pay. Singletary declined the offer. However, Singletary later agreed to transfer from WMCC to Western Reception Diagnostic and Correctional Center in St. Joseph. After Singletary left WMCC, a former employee of the Department allegedly heard Superintendent Moore refer to Singletary, stating, "that nappy headed little nigger won't be bothering us anymore. I got rid of him."

While Singletary was at WMCC, he never applied for a promotion and was never demoted. Singletary was never given leave without pay, and his benefits and pay rate were never reduced. Furthermore, Singletary's hours, job duties, and title as an Investigator never changed.

## II. *Discussion*

We review grants of summary judgment de novo. *Northern Natural Gas Co. v. Iowa Util. Bd.*, 377 F.3d 817, 820 (8th Cir. 2004). Summary judgment is appropriate if the record, viewed in a light most favorable to the non-moving party, contains no questions of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Kincaid v. City of Omaha*, 378 F.3d 799, 803 (8th Cir. 2004); *see also* Fed. R. Civ. P. 56(c). In addition, we afford the non-moving party all reasonable inferences to be drawn from the record. *Tlamka v. Serrell*, 244

F.3d 628, 632 (8th Cir. 2001). The moving party bears the burden of showing both the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. *Kincaid*, 378 F.3d at 803–04 (8th Cir. 2004); *see also* Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *Kincaid*, 378 F.3d at 804 (8th Cir. 2004); *see also* Fed. R. Civ. P. 56(e).

## A. *§ 1981 Liability*

Singletary first argues that the district court erred in granting summary judgment to the Department on his § 1981 claim. The Department argues that it is shielded by immunity from § 1981 liability under the Eleventh Amendment to the United States Constitution. While it is unclear whether the Department argued immunity to the district court, Eleventh Amendment immunity can be raised for the first time on appeal. *Randolph v. Rodgers*, 253 F.3d 342, 345 n.3 (8th Cir. 2001) (citing *Edelman v. Jordan*, 415 U.S. 651, 678 (1974)). We have yet to decide whether a state enjoys Eleventh Amendment immunity against § 1981 liability. However, other circuits have uniformly held that a state is immunized from § 1981 liability under the Eleventh Amendment. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (holding that Texas Tech and Texas Tech employees enjoy Eleventh Amendment immunity and qualified immunity respectively against § 1981 claims); *Mitchell v. Los Angeles Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) (holding that state entities possess Eleventh Amendment immunity from § 1981 claims); *Freeman v. Michigan Dept. of State*, 808 F.2d 1174, 1178 (6th Cir. 1987) (surveying circuits holding that an action may not be brought against a state pursuant to § 1981). We agree with our sister circuits and conclude that the Department is immunized from any claim by Singletary brought under § 1981.[3]

---

[3]The district court reasoned that Singletary's § 1981 claim failed as a matter of law because, as an at-will employee, he failed to plead the requisite contractual

## B. *Race Discrimination*

Singletary next contends that the district court erred in determining that he failed to state a prima facie case of race discrimination under Title VII because he did not suffer an adverse employment action. A prima facie case requires Singletary to show that: (1) he is a member of a protected class; (2) he was meeting the employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) "similarly situated employees outside the protected class were treated differently." *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (citations omitted). The district court concluded that Singletary failed to produce evidence that he suffered an adverse employment action.[4] We have described an adverse employment action as "a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (citations omitted).

---

employment relationship. *Citing Blumenthal v. Murray*, 995 F. Supp. 831, 835 (N.D. Ill. 1998). We have held that an at-will employee, employed without a written contract in an agreement terminable at will by either party, has a "contract" within the meaning of civil rights statute guaranteeing equal rights to make and enforce contracts. *Skinner v. Maritz, Inc.,* 253 F.3d 337, 339 (8th Cir. 2001); *see also Turner v. Arkansas Ins. Dept.*, 297 F.3d 751, 759 (8th Cir. 2002) (surveying the law and concluding that it was "clearly established" that at-will employees could sue for employment discrimination under § 1981). Because we hold that the Department is immune from Singletary's § 1981 claim, we need not address the issue or any discrepancy between our precedent and the Northern District of Illinois.

[4]Singletary argues that the district court erred by failing to address his concerns in light of direct evidence of discrimination. Generally summary judgment under Title VII falls under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). A plaintiff may also survive summary judgment by providing "direct evidence" of discrimination. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

Singletary makes several claims of adverse employment, the most substantive of which, is his claim that he was placed on administrative leave pending an investigation by the Department.[5] During the administrative leave, Singletary maintained his pay, grade, and benefits. In addition, once the investigation concluded, Singletary was promptly returned to his original position as an Investigator II. The Sixth Circuit has held that a woman who was placed on paid administrative leave pending the outcome of an investigation, and was restored to her position after the investigation, did not suffer an adverse employment action under Title VII. *Peltier v. United States*, 388 F.3d 984, 988–89 (6th Cir. 2004); *see also Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000) (holding that a police officer did not suffer any "adverse employment actions" by being placed on paid administrative leave when he retained his job and had not been demoted or transferred to less desirable position); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (concluding that employer's placement of employee on short administrative leave with pay to allow time for internal investigation of complaint in accordance with procedures was not an adverse employment action). We find the reasoning of Fourth, Fifth, and Sixth

---

[5]We do not find Singletary's other claims persuasive. The fact that a supervisor considered Singltary's administrative leave to be a formal disciplinary action is meaningless. *See Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (holding that formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions). Likewise, the unwanted investigations that were predicated on complaints, some of which were factually substantiated, does not rise to the level of an adverse employment action. *Jones v. Fitzgerald*, 285 F.3d 705, 713 (8th Cir. 2002) (holding that two internal investigations, which were warranted by admitted misconduct, were legally insufficient to constitute an "adverse employment action"). Singletary's complaint that the Department tried to demote him is not supported by the record. He was never demoted, and the Department addressed Singletary's requests for a transfer by offering him various positions that, while different in status, allowed him to remain at the same pay and grade. Likewise, Singletary was never forced to transfer; rather, he requested and eventually received a transfer to another facility.

circuits persuasive and hold that Singletary did not suffer an adverse employment action by being placed on administrative leave.

## C. *Retaliation*

Singletary argues that the district court erred in granting summary judgment on his claim of retaliation. Like his claim of discrimination, Singletary's retaliation claim fails because of his inability to show an adverse employment action. To make a prima facie case of retaliation against an employer, Singletary must show that: (1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct. *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1078–79 (8th Cir. 2005). As already detailed above, Singletary can point to no adverse employment action as a matter of law. Accordingly, the district court properly granted summary judgment on this claim.

## D. *Racial Harassment – Hostile Work Environment*

Finally, Singletary contends that he has produced sufficient evidence to withstand summary judgment with regard to his claim of a racially driven hostile work environment. To establish a Title VII race-based hostile work environment claim, a plaintiff must show that: (1) he or she is a member of a protected group; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment. *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 800 (8th Cir. 2003). In this case it is clear that Singletary, as an African-American, is a member of a protected group. Furthermore, Singletary's allegations, if proven, would show that he was referred to by derogatory names in the workplace.

This claim turns on whether the harassment alleged by Singletary affected a term, condition, or privilege of his employment. Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). For harassment to affect a condition of employment the conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998). Hostile work environment harassment occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (internal quotations omitted). To decide whether a work environment is objectively offensive, that is, one which a reasonable person would find hostile or abusive, we examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004).

The district court heavily relied on *Tademe* where we held that the evidence was insufficient to establish a hostile work environment because it merely showed that the harassment stemmed from inter-departmental politics and personality conflicts. *Tademe*, 328 F.3d at 991. Likewise, the record in this case shows that many of the difficulties stemming from Singletary's position as an Investigator resulted from departmental politics between the administrators. More specifically, Singletary's position as an internal investigator was often at odds with other employees of the Department. Singletary, however, points out that racially-derogatory terms and phrases were common place at WMCC. Specifically, Singletary had information, although not first-hand, that some workers and managers had referred to him as a nigger when talking with others. We have held that racial slurs alone do not render

a work environment hostile as a matter of law. *Loffredo Gardens, Inc.*, 378 F.3d at 759–60. In *Loffredo Gardens*, we stated:

> Under our case law, the racial slurs did not render the work environment . . . objectively hostile. For example, . . . we held six instances of racially derogatory language from managers and coworkers over the course of a year and a half, together with burning cross graffiti, did not render the workplace objectively hostile. Although managers and coworkers said, "that damn nigger," "damn black," "nigger s* *t, radio," "nigger-rigging," and "f* * *ing nigger," we pointed out two of the comments were not made to the plaintiff, two were not referring directly to him, and another was made in the heat of an altercation involving threats by the plaintiff.

*Id.* (citations omitted). This case is no more severe than those facts referred to in *Loffredo Gardens*; *but see Ross v. Douglas County, Nebraska*, 234 F.3d 391 (8th Cir. 2000) (holding that a supervisor's constant use of racial epithets towards a black employee was sufficient to create racially hostile work environment in violation of Title VII). Here, none of the comments were made directly to Singletary. Furthermore, when supervisors learned of one incident, the responsible employee was demoted. Racial epithets are morally repulsive. But our cases require that a plaintiff show more than an a few occurrences over a course of years. To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile.

Other than these comments made to others, Singletary relies on the fact that his vehicle was vandalized on several occasions. The district court concluded that any connection between the vandalism and racial comments was too speculative to create a question of fact for the jury. The Seventh Circuit has explained that for conduct to be considered in a race-based hostile work environment claim, the conduct must "have a racial character or purpose to support a hostile work environment claim." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Acts of apparently

-10-

indiscriminate vandalism do not have sufficient racial character to establish a hostile work environment without proof that race motivated the conduct.

### III. *Conclusion*

For the foregoing reasons, we affirm the district court's order granting summary judgment in favor of the Missouri State Department of Corrections.

_____