# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2294

_____

| | | |
|---|---|---|
| Dr. Leonard Chukwualuka Onyiah, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| St. Cloud State University; Board | * | District of Minnesota. |
| of Trustees, Minnesota State | * | |
| Colleges and Universities, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: February 15, 2012
Filed: July 2, 2012

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

BENTON, Circuit Judge.

Dr. Leonard Chukwualuka Onyiah sued St. Cloud State University and the Board of Trustees of Minnesota State Colleges and Universities (collectively, the University) for wage discrimination based on race, national origin, and age in violation of Title VII of the Civil Rights Act, **42 U.S.C. § 2000e-2(a)(1)**, and the Age Discrimination in Employment Act (ADEA), **29 U.S.C. § 623(a)(1)**. The district

court[1] granted summary judgment to the University, dismissing all claims with prejudice. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

Onyiah – a black man born in Nigeria in 1949 – is a professor at the University. He earned several degrees overseas – including a Ph.D. in Applied Statistics in 1989 – and taught for more than 17 years in Europe and Africa before immigrating here in 1997.

The University hired Onyiah three times. In August 1998, it posted a fixed-term, assistant professor position[2] in the Department of Statistics/Computer Networking ("SCN") for the 1998-99 academic year. Onyiah – then in Maryland – applied, accepted the position, and moved to Minnesota. The University renewed his position for 1999-2000, but not 2000-01. During the 1999-2000 term, the University posted a tenure-track, assistant professor position for 2000-01. Onyiah applied for the position, but it was given to Dr. Byron Gajewski. The University re-hired Onyiah as a fixed-term, assistant professor for the 2001-02 term. During that term, the University posted a tenure-track, open-rank position. Onyiah applied and was hired as a tenure-track, associate professor in January 2002. Since then, he has remained continuously employed with the University, receiving tenure in 2005 and a promotion to professor in 2006.

When he filed this action, Onyiah was the lowest paid faculty member in the SCN Department. His current, comparatively low salary results from the initial salary set when he was last hired by the University in 2002. The University is in the

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

[2]The University has four ranks for its faculty, in descending order: professor, associate professor, assistant professor, and instructor.

Minnesota State Colleges and Universities ("MnSCU") system. The instructional faculty of MnSCU institutions are represented by the Inter-Faculty Organization ("IFO"), which enters into a new collectively bargained agreement ("CBA") every two years. After a newly-hired professor's initial salary is set, his or her salary progresses only as set out in the CBA, which provides for raises upon promotion, after certain terms of service (10, 20, or 30 year), during periodic MnSCU/IFO salary reviews, or through IFO negotiation. The University can change a professor's salary by entering into a memorandum of agreement with the professor or "recoding" the professor with a different discipline or department.

The CBA does not control how initial faculty salaries are set. The dean of the College of Science and Engineering ("COSE"), with input from the chair of the SCN Department, determines the initial salary to offer a candidate. Before 2004, the dean input various criteria into University-provided paper grids, which returned an allowable range of salaries. These criteria include the candidate's assigned rank, academic discipline, degree, experience outside MnSCU, and experience within MnSCU. In 2004, the paper grids were replaced with a computer-based algorithm (which uses similar criteria). After the dean offers a salary within the range, the candidate can accept it, reject it, or negotiate. To offer a salary beyond the range, the dean must identify a special need and get approval from the provost.

When Onyiah was first hired in 1998, Dr. A.I. Musah, a black man born in Ghana, was the dean of COSE. Dr. H. Bayo Lawal, a black man born in Nigeria, was the chair of the SCN Department. Lawal recommended hiring Onyiah and suggested a starting salary of $38,681.00, which was within the salary range for an assistant professor with Onyiah's experience. Dean Musah ultimately offered Onyiah $43,732 – above the range. Onyiah accepted without negotiation. His salary increased to $47,380 for the 1999-2000 term, pursuant to the CBA. (That salary appears to come from the CBA's salary table for the *2000-01 term* and is a mistake in Onyiah's favor.)

When Onyiah was re-hired in 2001, Musah was again the dean, and Dr. David H. Robinson, a white man, was chair of the SCN Department. Musah offered Onyiah $47,380 – the same amount he was previously paid, which was at the high end of the range. Onyiah accepted without negotiation.

When Onyiah was re-hired again in 2002, Musah was still the dean and Robinson still the chair. Musah offered Onyiah $52,087, the mid-point of the salary range. Onyiah complained to Lawal that the salary was too low. Lawal – who was not the chair or dean – opined that Musah could only offer $5,000 more than Onyiah's previous salary without "raising eyebrows." Onyiah accepted the salary of $52,087. Since then, his salary has increased pursuant to the CBA.

In January 2007, Onyiah filed a charge of discrimination with the Equal Employment Opportunities Commission, alleging discrimination based on race, national origin, and age. After receiving a right-to-sue letter, he sued in the district court in August 2008, amending the complaint in April 2009. In September 2009, the district court dismissed all claims except those for salary discrimination against the University.[3] In May 2011, the district court, after excluding the expert testimony of Dr. Ravindra N. Kalia, granted summary judgment to the University on all remaining claims.

I.

This court reviews de novo a grant of summary judgment. *Heacker v. Safeco Ins. Co.*, 676 F.3d 724, 726 (8th Cir. 2012). "Summary judgment should be granted

---

[3]Onyiah does not appeal the dismissal of his refusal-to-hire and hostile-work-environment claims against the University, his failure-to-represent and breach-of-fiduciary-duty claims against the IFO, or his intentional-infliction-of-emotional-distress claim against all defendants.

when – viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences – the record shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* at 726-27, *citing* **Fed. R. Civ. P. 56(a)**; *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.) (en banc), *cert. denied*, 132 S. Ct. 513 (2011). "This court may affirm the summary judgment decision on any basis supported by the record." *Heacker*, 676 F.3d at 727.

Onyiah argues that the district court erred in granting summary judgment on his Title VII and ADEA claims.

A.

1.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation . . . because of such individual's race, color, religion, sex, or national origin." **42 U.S.C. § 2000e-2(a)(1)**. Absent direct evidence of discrimination, Onyiah's Title VII salary-discrimination claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Torgerson*, 643 F.3d at 1044. Under this framework, Onyiah must first establish a prima facie case of discrimination. *Id.* at 1046. To do so, he must show: (1) he is a member of a protected class; (2) he was meeting the University's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). The burden of production then shifts to the University to "articulate a legitimate, nondiscriminatory reason" for the pay disparity. *Torgerson*, 643 F.3d at 1044. The burden then shifts back to Onyiah to prove that the

-5-

proffered reason is pretext for discrimination. ***Id.*** He retains at all times the ultimate burden of proof and persuasion that the University discriminated against him. ***Id.***

Even assuming that Onyiah made a prima facie case of salary discrimination based on his race and national origin by identifying professors outside of those classes who receive a higher salary, he did not meet his burden of showing that the University's explanation for his compensation was pretext for discrimination. *See* ***Martinez v. W.W. Grainger, Inc.***, 664 F.3d 225, 231 (8th Cir. 2011). The University explained Onyiah's lower salary as the result of (1) the University's established policy for setting salaries – all three of the salary offers were within or above the range set by the paper grids – and (2) Onyiah's failure to negotiate for more money. *Cf.* ***Hatchett v. Health Care & Retirement Corp.***, 186 Fed. Appx. 543, 549 (6th Cir. 2006) (unpublished) (finding a defendant successfully met its *McDonnell Douglas* burden because the plaintiff's lower salary was due in part to her failure to negotiate).

"There are at least two ways [Onyiah] may demonstrate a material question of fact regarding pretext." ***Torgerson***, 643 F.3d at 1047. He may show that the University's explanation is unworthy of credence because it has no basis in fact, or he may show pretext by persuading the court that discriminatory animus more likely motivated the University. ***Id.*** "Either route amounts to showing that a prohibited reason, rather than [the University's] stated reason, actually motivated" his salary. ***Id.***

First, Onyiah argues that the University's explanation has no basis in fact because the incorrect salary grid was used. He believes – given his experience – he

was improperly given the rank of assistant professor when he was hired in 1998 and 2001.[4] The CBA states:

> **Section D. Initial Assignment to Rank.** Qualifications for initial assignment to faculty rank are to be as follows.
>
> > **Professor:** Earned Doctorate or other appropriate degree, plus ten (10) years of collegiate-level teaching or related experience.
> >
> > **Associate Professor:** Earned doctorate or other appropriate degree, plus seven (7) years of collegiate-level teaching or experience.
> >
> > **Assistant Professor:** Earned doctorate or other appropriate degree.
> >
> > **Instructor:** Appropriate preparation.
>
> Normally, no faculty member may be assigned to a rank more than one (1) level below that for which he/she is qualified. In each instance, the President shall establish what constitutes appropriate experience and appropriate degrees for the purpose of assignment to rank.

Onyiah believes that his degree and experience overseas qualified him to be a professor and that the University violated the CBA in assigning him to a rank of assistant professor, more than one level below professor. However, the University explained that the CBA's assignment-of-rank provision applies only when a candidate

---

[4]The University asserts that the salaries set in 1998 and 2001 are irrelevant, because Onyiah's current salary can be traced to the salary set in 2002. However, taking all reasonable inferences in Onyiah's favor, there is at least some connection between his current salary and that first assigned to him in 1998. In 2002, Lawal opined that Dean Musah could only give Onyiah a starting salary that was $5,000 more than his 2001-02 salary, which derived from the salary set in 2001. And in 2001, his initial salary exactly matched his 1999-2000 salary, which derived from the salary set in 1998.

seeks an open position, and Onyiah twice applied for positions with the advertised rank of assistant professor.

Second, Onyiah contends that the salaries paid to non-black, non-Nigerian professors is evidence of pretext. He has the burden to prove that he and these higher paid professors are "'similarly situated in all relevant respects' – a 'rigorous' standard at the pretext stage." *Torgerson*, 643 F.3d at 1051, *quoting **King v. Hardesty***, 517 F.3d 1049, 1063 (8th Cir. 2008). Onyiah directs this court to 29 C.F.R. § 1620.18 as the appropriate standard for determining similarly situated employees. However, this regulation clarifies the meaning of "similar working conditions" in the Equal Pay Act (EPA), **29 U.S.C. § 206(d)(1)**, which prohibits wage discrimination based on sex. *See **EEOC v. State of Del. Dep't of Health & Soc. Servs.***, 865 F.2d 1408, 1417 (3d Cir. 1989); *see also **Bauer v. Curators of the Univ. of Mo.***, ___ F.3d ___, ___, 2012 WL 2014278, at *2 (8th Cir. June 6, 2012) ("Gender discrimination claims may be brought under both Title VII and the Equal Pay Act, but the laws differ."). This regulation is not relevant in determining whether employees are similarly situated at the pretext stage of a Title VII salary discrimination case.

Onyiah fails to show that he and the non-black, non-Nigerian professors are similarly situated in all relevant respects. Onyiah identifies Dr. Michael Ernst, Dr. David H. Robinson, Dr. Richard A. Sundheim, Dr. Gary Yoshimoto, Dr. Richard Paulson, and Dr. Jae Song as comparators.[5] All of these professors were hired and

---

[5]Throughout his brief, Onyiah argues that the University discriminated when it hired Dr. Byron Gajewski – rather than him – in 2000. True, Gajewski is neither black nor Nigerian, and substantially younger than Onyiah. However, his hire does not give rise to a salary-discrimination claim under Title VII or the ADEA, because he was paid less than Onyiah. The district court dismissed Onyiah's failure-to-hire claim arising from Gajewski's hire because it was time-barred when Onyiah filed his charge with the EEOC. Onyiah does not appeal that dismissal.

offered salaries by deans other than Musah. "When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects." *Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 910 (8th Cir. 1999); *Fields*, 520 F.3d at 864-65. The comparators were also hired when the University was not using the salary grids applied to Onyiah. *See Fields*, 520 F.3d at 864 (finding employees hired under different policies for setting salaries were not similarly situated).

Third, Onyiah argues that it is evidence of pretext that the University failed to remedy his salary through recoding or a memorandum of agreement, despite adjusting the salaries of some non-black, non-Nigerian professors. By a memorandum of agreement, the University did increase the salaries of certain minority members of the Computer Science Department after a study found an imbalance. However, Onyiah does not identify any evidence explaining the circumstances of that adjustment, showing a substantially similar imbalance existed in his case, or linking the University's refusal to remedy his salary to his race or national origin. Indeed, Onyiah admits that the University investigators that examined his request for a salary increase found that any underpayment was not due to his membership in a protected class. Onyiah does not present any evidence that their finding was motivated by unlawful discrimination.

Onyiah's claims of race and national-origin discrimination are further undercut by the high salaries given to Dr. Alfred Akinsete and Dr. Amos Olagunju, two black men born in Nigeria. In addition to being members of the same protected classes as Onyiah, they are the closest comparators: like Onyiah, they were hired by Musah to teach statistics in 2002. Each received salaries well above the salary range, significantly higher than Onyiah's, and higher than at least some of the non-black, non-Nigerian professors identified by Onyiah. *Cf. McIntyre v. Longwood Cent. Sch. Dist.*, 380 Fed. Appx. 44, 49 (2d Cir. 2010) (unpublished) (finding plaintiff failed to

establish prima facie case of salary discrimination in part because "not only did other members of the protected groups to which [the plaintiff] belongs not suffer similarly unfavorable treatment, in many cases they received especially high salary increases").

2.

Onyiah asserts that the district court erred in failing to address a claim of national-origin discrimination based on his tribal affiliation.[6] This court has not determined whether Title VII's "national origin" includes African tribal affiliation. *Cf. Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 154 F.3d 1117, 1120 (9th Cir. 1998) (holding that "discrimination on the basis of [Native American] tribal affiliation can give rise to a 'national origin' claim under Title VII"), *cited in Torgerson*, 643 F.3d at 1053. There is no need to do so here. The district court did not address the merits of any tribal affiliation claim because (1) Onyiah did not raise the issue in his EEOC charge and thus failed to exhaust his administrative remedies, and (2) he failed to raise the claim in his amended complaint. (The district court had previously denied as untimely his motion for leave to file a second amended complaint to add the tribal affiliation claim – which he does not appeal.)

Onyiah states that he sufficiently raised the issue of tribal-affiliation discrimination in both his amended complaint and his EEOC charge. However, his complaint, which has no reference to tribal affiliation, did not provide fair notice to the University that his national-origin discrimination claim rested on his tribal affiliation. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 664 (8th Cir. 2012) (requiring a complaint to "provide the defendant with fair notice of what the plaintiff's claim is *and the grounds upon which it rests*." (emphasis added) (internal quotation marks omitted)), *quoting Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806

---

[6]Onyiah alleges that he is a member of the Nigerian Igbo tribe, and that Lawal, Akinsete, and Olagonju are all members of the Nigerian Yoruba tribe.

(8th Cir. 2008). And, his EEOC charge only briefly refers to tribal affiliation in the context of a department chair election. The charge does not in any way link Onyiah's salary to his tribal affiliation. Even with all inferences drawn in his favor, Onyiah's EEOC charge failed to exhaust a claim for national-origin discrimination based on tribal affiliation. *See **Brooks v. Midwest Heart Grp.***, 655 F.3d 796, 801 (8th Cir. 2011).

The district court properly did not address the claims based on tribal affiliation. This court therefore need not address Onyiah's allegations that Lawal, a member of the Yoruba tribe, exerted too much influence in the salary-setting process.

B.

Onyiah challenges the district court's grant of summary judgment on his ADEA claim. The ADEA makes it "unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." **29 U.S.C. § 623(a)(1)**. The *McDonnell Douglas* framework applies. ***Rahlf v. Mo-Tech Corp.***, 642 F.3d 633, 637 (8th Cir. 2011). In order to establish a prima facie case under the ADEA, Onyiah must show: (1) he is over 40; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) substantially younger, similarly-situated employees were treated more favorably. ***Anderson v. Durham D & M, L.L.C.***, 606 F.3d 513, 523 (8th Cir. 2010). If Onyiah establishes a prima facie case of age discrimination, the burden of production shifts to the University to "articulate a legitimate, nondiscriminatory reason" for the pay disparity. ***Rahlf***, 642 F.3d at 637. If the University does so, Onyiah must show that its proffered reason was pretext for discrimination. ***Id.*** At all times, Onyiah retains the ultimate burden of persuasion that "age was the 'but-for' cause" of his lesser salary. ***Id.***, *citing **Gross v. FBL Fin. Servs., Inc.***, 557 U.S. 167, 176 (2009).

-11-

Again assuming that Onyiah has made a prima facie case of ADEA salary discrimination by identifying substantially younger professors who were paid more, he fails to prove that the University's explanation for his salary – compliance with University policy and his failure to negotiate – is pretext for age discrimination. *See Gibson v. American Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012).

Onyiah does not identify any evidence that supports an inference that age was the "but for" cause of his salary, beyond pointing to younger professors who are paid more. This does not create a material issue of fact at the pretext stage. *See Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) ("Although Carraher was replaced by someone substantially younger than him, in this case 28 years younger, we have previously held that this fact, though necessary to establish a prima facie case, possesses 'insufficient probative value to persuade a reasonable jury that [plaintiff] was discriminated against.'" (alteration in original)), *quoting Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir. 1996).

## C.

Onyiah argues repeatedly that the district court erred by failing to address his Title VII and ADEA discrimination claims under the Lilly Ledbetter Fair Pay Act of 2009 (FPA), Pub. L. No. 111-2, 123 Stat. 5, which – he contends – in some way altered the plaintiff's burden to prove salary discrimination in violation of Title VII or the ADEA. He, however, misstates the purpose of that legislation. Congress passed the FPA to change the statute of limitations for wage discrimination claims and to overrule the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007). The FPA reinstated the "paycheck accrual rule,"[7]

___

[7]Under the paycheck accrual rule, "a new claim under Title VII [arises] each time an employer issued a paycheck reflecting discriminatory wages, even if the discriminatory decision setting the amount occurred outside the limitations period

-12-

which the Court had rejected in *Ledbetter*. *See **Puffer v. Allstate Ins. Co.**,* 675 F.3d 709, 713 (7th Cir. 2012); ***Schwartz v. Merrill Lynch & Co., Inc.**,* 665 F.3d 444, 448-49 (2d Cir. 2011). Onyiah identifies no part of the FPA that changes the burden of proof on a plaintiff alleging salary discrimination under Title VII or the ADEA.

The district court's dismissal of Onyiah's race, national-origin, and age discrimination claims is affirmed.

## II.

Finally, Onyiah challenges the exclusion of the expert testimony of Dr. Ravindra N. Kalia, a professor of mathematics at the University. Onyiah offers Kalia as an expert on salaries at the University, who would establish what Onyiah's initial salary should have been and the total amount he was underpaid by the University. The district court excluded the testimony because Kalia was not qualified or – alternatively – because his testimony was irrelevant and unreliable. **Fed. R. Evid. 702**. This court reviews a district court's decision to exclude expert testimony for an abuse of discretion. ***Smith v. Bubak**,* 643 F.3d 1137, 1140 (8th Cir. 2007).

The district court did not abuse its discretion in excluding this testimony. "Expert testimony is inadmissible where, as here, it is excessively speculative or unsupported by sufficient facts." ***Barrett v. Rhodia, Inc.**,* 606 F.3d 975, 981 (8th Cir. 2010). Kalia's expert report contained no explanation for the initial salary. In a declaration in response to the University's motion to exclude his testimony, he

---

(i.e., more than 300 days before the filing of the first EEOC charge)." *See **Puffer**,* 675 F.3d at 713. Onyiah has already benefitted from the FPA. His salary discrimination claim – relying on an allegedly discriminatory decision made more than 300 days before his EEOC charge – would have been time-barred before the FPA.

explained that he reached the salary by working from the initial and current salaries of other University employees, using statistical computer software, the terms of the CBA, and inflation rates. However, none of these factors are relevant in establishing starting salaries at the University. Kalia stated that he did not use the University's salary grids, which – he acknowledges – are essential to calculating a starting salary. At most Kalia states that he – like all University faculty – is aware of the essential elements of the grids, but he admits never having seen the grids before rendering his opinion. His opinion, which is excessively speculative, was properly excluded.

* * * * * * *

The judgment of the district court is affirmed.

_____