# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-3299

_____

Micah Stone

*Plaintiff - Appellant*

v.

McGraw Hill Financial, Inc., formerly known as McGraw-Hill Companies

*Defendant*

McGraw-Hill Global Education Holdings, LLC, a New York Corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 13, 2016
Filed: May 15, 2017

_____

Before WOLLMAN, SMITH,[1] and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

Micah Stone filed suit against McGraw-Hill Global Education Holdings, LLC (McGraw-Hill), asserting claims of employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 213.055. Stone appeals from the district court's[2] order granting McGraw-Hill's motion for summary judgment. We affirm.

## I. Background

In February 2007, Stone, who is African American, was hired as a Sales Representative for McGraw-Hill in Miami, Florida. He sold textbooks and other educational products to instructors and administrators at Florida colleges. He was paid a base salary of $59,384.

Stone applied for a promotion to the position of Learning Solutions Consultant (LSC) in St. Louis, Missouri, Charlotte, North Carolina, and Columbus, Ohio. He contends that his applications for the positions in Charlotte and Columbus were not considered and that he was considered for the St. Louis position because he contacted McGraw-Hill's Vice President of Training and Professional Development. He had an in-person interview for the St. Louis position with Irene McGuinness, Vice President of Learning Solutions, and Elizabeth Wildes, Learning Solutions Manager for the Central Region. Stone claims that the parties agreed during this meeting that his starting salary would be $95,000. Stone sent a follow-up email to McGuinness purporting to confirm this agreement, to which McGuinness replied that Stone should not "get ahead of [himself]" because he had two more interviews. According to Stone, when he was ultimately offered the position with a salary of $85,000, he

---

[2]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

protested the reduction and asked Wildes if it was on account of his race, but accepted the offer after Wildes replied that Stone must "[t]ake it or leave it."

Five other LSCs in the Central Region reported to Wildes, all of whom were white. Anni Schleicher was promoted to the LSC position in July 2011, after working for approximately five years as a McGraw-Hill Sales Representative, at a salary of $83,600. Bridget Hannenberg was hired as an LSC at a salary of $85,000, after having worked as a Publishing Representative for Pearson Education for two years and one month. Christy Rybak was hired as an LSC at a salary of $85,000; the record is silent regarding her prior experience. Brad Ritter was hired as an LSC in the Columbus, Ohio, area and was paid a higher salary than Stone. Ritter had worked as a Solutions Consultant for Pearson Education for one year and eight months. Robert Scanlon was hired as an LSC in the Pittsburgh, Pennsylvania, area and was paid a higher salary than Stone. Scanlon had worked as a Sales Director for Pearson Education for three years and six months, and had worked for Cengage Learning for six years and nine months, first as a Sales Representative and then as a Technology Specialist.

Stone was paid his $85,000 LSC salary during his transition from the Sales Representative position to the LSC position, but claims that he was required to perform the work of both positions. He requested, but did not receive, a "Spot Bonus" to compensate him for performing this dual role. Wildes's affidavit states that Schleicher had also worked as both a Sales Representative and an LSC following her promotion and had received only her LSC salary. Stone responds that McGraw-Hill has offered no evidence showing that Schleicher was required to work in both positions; that even if she was required to do so, she was not required to travel as extensively as Stone; and that her work load would have been less than Stone's because she was promoted to LSC during the summer, when schools are closed, whereas Stone was promoted in September. Stone reported the alleged reduction in

his salary and the requirement to work both positions to McGraw-Hill's human resources department.

Stone disputes McGraw-Hill's claims that his performance as an LSC was deficient. Stone's position as an LSC required him to work with Wildes, the Learning Solutions Manager for the Central Region and his direct supervisor; Kim Nentwig, the District Sales Manager; and the Sales Representatives in his territory. Wildes states that she received complaints from Sales Representatives that Stone had communicated with them in an arrogant and offensive manner, that he was late to meetings with them, and that "[n]o one in the district is happy with Micah." Stone contends that these statements, as reported by Wildes in a December 28, 2011, email to McGuinness, reflect the complaints of only one Sales Representative. Wildes and McGuinness discussed Stone's alleged performance deficiencies with him during a national sales meeting in Phoenix, Arizona, on January 7, 2012. On January 15, 2012, Wildes sent Stone an email memorializing the January 7 discussion. This email instructed Stone to be on time when meeting with Sales Representatives and customers; to work all day on college campuses with Representatives; to notify a Representative in advance before contacting a professor on the Representative's campus; to avoid discussing royalties in a manner that seems to "buy[] adoptions"[3]; and to respond to Representatives' phone calls and emails within twenty-four hours.

Wildes gave Stone a written warning on March 8, 2012. The warning identified specific instances in which Stone had exhibited "Problematic Communications and Working Relationships with Key Collaborators": on January 13, Stone had walked out of a meeting with Nentwig and another employee; the employee at the January 13 meeting reported that she hung up on Stone during a February 6 phone call, during which Stone used an aggressive tone and tried to coerce her into

_____

[3]An "adoption" is an instructor's decision to use a McGraw-Hill product in his or her class, and a "royalty" is a percentage of each sale paid to a product's author.

agreeing with Stone's perspective on the meeting; communication between Stone and his colleagues had broken down because Stone used a "hostile or condescending tone"; Stone had placed an excessive number of phone calls to Wildes and another employee without leaving messages; and several Representatives had complained that Stone was arrogant and belligerent. The warning identified instances in which Stone had displayed "Punctuality and Attendance Issues": on January 31, Stone failed to attend a dinner meeting without advance notice; on February 23, Stone emailed that he would be unable to attend a dinner meeting thirty minutes after he was supposed to have met his colleagues to walk to the dinner; and several Representatives reported that Stone had been late to on-campus meetings, in one case by an hour. The warning stated that had Stone displayed "Follow-up and Response Time Delays" in responding to phone calls and emails. Finally, the warning stated that Stone had shown "Organization of Work Issues" by failing to complete trip reports for campus visits and relying heavily on others to complete large projects. The warning set forth actions to improve Stone's performance, including that Stone should copy Wildes on all his communications with customers and colleagues and that Stone should work three to four days a week on campus with Sales Representatives. It also instructed Stone to provide Wildes a plan of his weekly activities on Monday of each week and to inform Wildes at the end of each day what he had accomplished that day. The warning stated that failure to meet the expectations set forth therein would lead to further disciplinary action, including possible termination. Wildes subsequently informed Stone, in emails and phone calls, that Stone was not meeting the goals set forth in the written warning.

Stone disputes that his performance was deficient. He claims that he walked out of the January 13 meeting because Nentwig forcibly grabbed his arm. When asked why Nentwig did this, Stone replied that Nentwig is aggressive; he had heard that Nentwig had thrown water bottles at Representatives in the past. Nentwig denies that she grabbed Stone's arm. She sent Stone an email the day after the meeting, apologizing for "upsetting" him. Stone contends that he missed or arrived late to

meetings only with good reason and that he had good working relationships with Representatives. He argues that the requirements to work three to four full days on campus with Representatives and prepare trip reports for every campus visit were overly burdensome and were not enforced against other LSCs.

Stone also alleges that during a conference in Pittsburgh, Pennsylvania, on January 31, he overheard Hannenberg ask Wildes, "What are you going to do about Micah?" and Wildes reply, "I wish I had never hired his black ass." Wildes denies making this statement.

Stone alleges that Wildes and Nentwig purposefully interfered with his relationships with Sales Representatives. Sales Representative Susan Vorwald testified that Wildes had asked her, for no reason, if Stone had done anything inappropriate during a meeting between the two, and Vorwald had replied that Stone had not. Vorwald testified that Nentwig had written in an email: "If your confidence is lower working with Micah, submit the leads and Tricia will handle [them]." In a separate conversation, Nentwig had instructed Vorwald to cease working with Stone. Likewise, Sales Representative Justin Brauchie stated that Nentwig had asked him leading questions, including asking, for no reason, "Why don't you want to work with Micah?" Brauchie also stated that at one point Nentwig told him not to return Stone's calls, and that "[i]t was apparent that Kim Nentwig was deliberately creating the opportunity for McGraw-Hill to get rid of Micah."

Stone was discharged on April 26, 2012, for "poor performance," on Wildes's recommendation. He filed a First Amended Complaint against McGraw-Hill on April 7, 2014, alleging that he was unfairly compensated, subjected to a hostile work environment, and wrongfully discharged on account of his race and in retaliation for

protesting his disparate treatment, in violation of Title VII, 42 U.S.C. § 1981,[4] and the MHRA. The district court granted summary judgment to McGraw-Hill on the salary discrimination claim, reasoning that Stone had failed to establish a *prima facie* case because three white LSCs were paid a salary equal to or less than Stone's. Further, the court held that even if Stone had established a *prima facie* case regarding the two white LSCs who were paid more than he was, he did not establish that McGraw-Hill's explanation was pretext for discrimination. With respect to the hostile work environment claim, the court held that the one alleged race-based comment was insufficient to create a hostile work environment and that Stone had failed to establish a causal nexus between his race and his alleged treatment by Wildes and Nentwig. As for the discriminatory discharge claim, the court held that even if Stone had established a *prima facie* case, he had failed to show that McGraw-Hill's stated reasons for discharging him were pretext for discrimination. The court also held that Stone had abandoned his retaliation claim by failing to address it in his opposition to summary judgment. Accordingly, the court granted McGraw-Hill's motion for summary judgment.[5]

---

[4]Because Stone relies on circumstantial evidence of discrimination, the district court correctly assessed his 42 U.S.C. § 1981 claim under the same standard as his Title VII claim, and we do the same. See Johnson v. AT & T Corp., 422 F.3d 756, 761 (8th Cir. 2005).

[5]The district court also granted summary judgment to McGraw-Hill on Stone's MHRA claim. In his opening brief on appeal, Stone merely mentioned the MHRA in passing. By failing to explain why his state-law claim should survive, he has waived any appeal from the adverse grant of summary judgment on the MHRA claim. See Ahlberg v. Chrysler Corp., 481 F.3d 630, 634 (8th Cir. 2007) ("[P]oints not meaningfully argued in an opening brief are waived.").

## II. Discussion

We review *de novo* the grant of summary judgment. Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 890 (8th Cir. 2005). "Summary judgment is appropriate if the record, viewed in a light most favorable to the non-moving party, contains no questions of material fact and demonstrates that the moving party is entitled to judgment as a matter of law." Id.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Absent direct evidence of discrimination," we analyze a Title VII discrimination claim under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Onyiah v. St. Cloud State Univ., 684 F.3d 711, 716 (8th Cir. 2012). A plaintiff bears the initial burden to establish a *prima facie* case of discrimination by showing that: "(1) he is a member of a protected class; (2) he was meeting the [employer's] legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently." Id. The burden then shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. Id. (citation omitted). "The burden then shifts back to [the plaintiff] to prove that the proffered reason is pretext for discrimination." Id. The plaintiff "retains at all times the ultimate burden of proof and persuasion." Id.

### A. Salary Discrimination Claim

The district court correctly held that even if Stone could establish a *prima facie* case of discrimination based on the two white LSCs—Brad Ritter and Robert Scanlon—who were paid a higher starting salary than Stone, Stone has not shown that

McGraw-Hill's proffered reasons for the salary disparity were pretext for discrimination. Stone had the burden to show that Ritter and Scanlon were "similarly situated in all relevant respects—a rigorous standard at the pretext stage." Onyiah, 684 F.3d at 717 (internal quotation marks omitted) (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1051 (8th Cir. 2011) (en banc)). The district court concluded that Stone had failed to meet this burden because Ritter and Scanlon "were hired from competitors of McGraw-Hill and had prior experience in roles similar to the LSC position." McGraw-Hill argues that Ritter and Scanlon were paid a higher starting salary than Stone because "each differed from Stone as to circumstances of his hire, prior experience, cost of living, and territory assigned." Stone has conceded that Scanlon had more experience in the publishing industry than Stone at the time he was hired as an LSC, but argues that Ritter had less experience than Stone did when Ritter applied for the LSC position. Assuming that the evidence Stone offered to support this argument may be properly considered on a motion for summary judgment, it does not show that McGraw-Hill's other proffered reasons—that Ritter was hired from a competitor and was assigned a different territory—were pretext for discrimination.[6]

Stone also failed to establish a *prima facie* case of salary discrimination on his claim that he was unfairly denied a "Spot Bonus" for performing the work of both an LSC and a Sales Representative. McGraw-Hill notes that Schleicher, who was also temporarily required to work as both an LSC and a Sales Representative, was not paid a "Spot Bonus." Stone distinguishes his case from Schleicher's on the basis that his work load and travel requirements were greater, but in any event Stone fails to establish a *prima facie* case because he has identified no similarly situated employee

---

[6]Even if, as Stone contends, McGraw-Hill had advertised that the LSC position required five years' experience in higher-education sales, the fact that Ritter was not held to this requirement does not by itself show that the reasons for hiring him nonetheless demonstrated pretext.

who was treated differently than he was, namely, another employee who was required to work as both an LSC and a Sales Representative and received extra compensation therefor.

## B. Hostile Work Environment Claim

Stone contends that the district court erred in granting summary judgment to McGraw-Hill on his hostile work environment claim. "Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Tademe v. St. Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003) (internal quotation marks omitted) (quoting Bradley v. Widnall, 232 F.3d 626, 631 (8th Cir. 2000)). "To establish a Title VII race-based hostile work environment claim, a plaintiff must show that: (1) he or she is a member of a protected group; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment." Singletary, 423 F.3d at 892. "Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment." Id.

The district court properly held that Stone had failed to show a causal connection between the alleged acts of harassment and his race. Stone offered no evidence of racial motivation when, allegedly, Nentwig forcibly grabbed his arm during a meeting,[7] Wildes and Nentwig interfered with Stone's working relationships with his colleagues, and Wildes subjected Stone to unduly harsh work requirements.

---

[7]Stone asserts that "although [he] was not specifically asked whether Nentwig's conduct was motivated by race, and he never so testified," he alleged a racial motive in his First Amended Complaint and he "believes that Nentwig['s] conduct was racially motivated." This mere allegation is insufficient to defeat a motion for summary judgment. Fed. R. Civ. Proc. 56(c).

-10-

Moreover, Stone stated at his deposition that he was not accepted as a member of Wildes's team because, unlike the rest of the sales team, Stone had not worked with Wildes while she was working for Pearson. See Tademe, 328 F.3d at 991 (affirming summary judgment on hostile work environment claim because "[t]he evidence shows beyond genuine dispute that the harassment stemmed from inter-departmental politics and personality conflicts").

We also agree with the district court's conclusion that the one race-related comment that Stone allegedly overheard does not constitute harassment sufficiently severe and pervasive to support a hostile work environment claim. See Singletary, 423 F.3d at 893 (holding that colleagues' use of racial epithets referring to the plaintiff did not create a hostile work environment and stating that "our cases require that a plaintiff show more than [a] few occurrences over a course of years"). Accordingly, we affirm the district court's grant of summary judgment on Stone's hostile work environment claim.

## C. Discriminatory Discharge Claim

Stone argues that the district court erred in granting summary judgment on his claim that he was discharged on account of his race. We agree with the district court that even if Stone had established a *prima facie* case of discriminatory discharge, he did not meet his burden to show that McGraw-Hill's proffered reason for discharging him was pretext for discrimination. Stone's documented performance deficiencies constituted a legitimate, nondiscriminatory reason for discharging him. The district court properly rejected Stone's claims that he was subject to harsher work requirements than other LSCs, because none of the other LSCs had been issued a written warning and thus were not similarly situated to Stone in all relevant respects. See Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 798 (8th Cir. 2011) ("To succeed in showing pretext [] the employee 'must provide some evidence that other

-11-

employees were not subject to the same level of investigation for similar conduct.'" (quoting Wierman v. Casey's Gen. Stores, 638 F.3d 984, 997-98 (8th Cir. 2011))).

Notwithstanding Stone's argument that his performance was not deficient, he has not shown that either his receipt of a written warning or his termination for failure to meet the improvement goals outlined in the warning were pretext for discrimination. Stone has produced evidence to show that his performance was not actually deficient, but he has not produced evidence showing that Wildes did not believe that Stone's performance was deficient based on the reports she received. See Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 842 (8th Cir. 2008) ("In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred."). Even if Stone is correct that Wildes overstated his shortcomings and that many of the deficiencies she identified were due to factors beyond his control, the evidence is insufficient to support a conclusion that McGraw-Hill used Stone's documented performance deficiencies as pretext to discharge him on account of his race.

## D. Retaliation Claim

Stone does not seem to challenge the district court's conclusion that he had abandoned his retaliation claim. See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009). In any event, any claim of retaliatory action would fail, because Stone has produced no evidence showing a causal connection between the alleged retaliatory act and protected conduct. See Arraleh v. County of Ramsey, 461 F.3d 967, 977-78 (8th Cir. 2006) (noting that temporal proximity alone is generally insufficient to create a genuine factual dispute on a retaliation claim).

The judgment is affirmed.

_____